IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 23, 2003

## DOLWIN DEON CORMIA v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 238254     Douglas A. Meyer, Judge**

**No. E2003-00653-CCA-R3-PC**
**October 27, 2003**

A Hamilton County jury convicted the Petitioner, Dolwin Deon Cormia, of first degree murder and abuse of a corpse, and the trial court imposed a life sentence with the possibility of parole plus a concurrent two year sentence. On direct appeal, this Court affirmed the conviction, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. The Petitioner then sought post-conviction relief, alleging that he was denied effective assistance of counsel. Following a hearing on the post-conviction petition, the trial court dismissed the petition, and this appeal ensued. We affirm the trial court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

John G. McDougal, Chattanooga, Tennessee, for the appellant, Dolwin Deon Cormia.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; William H. Cox, III, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Facts

Our Court summarized the underlying facts of the Petitioner's case on direct appeal as follows:

> In the light most favorable to the state, the evidence at trial demonstrated that the defendant, Dolwin Deon "Lucky" Cormia, an East Los Angeles native, came to Chattanooga in the Spring of 1996 with Chris "May-May" Cameron and Dereath

"Malik" Polydore. Cameron was in the marijuana trade, and upon learning from the defendant that marijuana could be sold much more profitably in Chattanooga than in Los Angeles, he agreed to pay the defendant to accompany him to Chattanooga and to introduce him around town. The three arrived on a Greyhound bus in April 1996. Apparently, the business developed suitably, and the three stayed in Chattanooga for at least three weeks. During this time, the three lived in the apartment home of Jamie Sammons, the defendant's girlfriend. Cameron and the defendant sold marijuana during this time, and the proceeds were split equally among these two men and Polydore.

Meanwhile, on Saturday, April 27, 1996, the victim, Welton Green, Jr., called on his friend Kirby Marshall at the Lady Luck Beauty Salon, which was owned by Marshall and his wife. The victim, who was from California, was driving a large, late model, rented Mercury with California license plates. Marshall and the victim spent time driving around town that afternoon and made plans to go out later that evening.

Later, Marshall and the victim went to a nightclub, The Whole Note, but they were denied admission because of their attire. They purchased alcohol and sat outside in the parking lot consuming it until after the club closed. That same evening, the defendant, Polydore and Cameron were inside The Whole Note with Sammons and other female companions. The defendant and Sammons got into an argument at the club, and Sammons went home. After the club closed, the defendant and Cameron went to a Waffle House.

When they arrived at the Waffle House, they encountered the victim and Marshall. The victim and the defendant hugged each other, although the defendant told the victim he did not know whether he should hug him or kill him. Cameron had heard the defendant speak of the victim stealing money from him, so he was surprised to see the two hugging. Cameron's pager went off, and the victim offered to let Cameron use a cellular telephone in his car. While the victim was retrieving the telephone, Marshall told the defendant that the victim had a half kilo of cocaine and some money with him in Chattanooga. Marshall also revealed the location of the victim's hotel room.

A group of young women approached, and a plan was soon devised for the victim, the defendant, and two of the women to go to the victim's hotel room for the remainder of the night. Cameron, who had by now returned the call to his pager, decided to return to Sammons' apartment.

The next morning, the defendant arrived at Sammons' apartment and made some telephone calls. Cameron was still in bed, but he overheard the defendant saying, "The guy is out here," or "The guy is here." After Cameron arose, the

defendant inquired whether he would like "to go on a lick." In other words, the defendant was inviting Cameron to participate in a robbery. Because he was tired and had a hangover, Cameron declined. However, Varian LaShon "Skinny" Ford arrived to pick up the defendant.

According to Ford, however, he met the defendant at the Big Orange Car Wash. The defendant made a telephone call, which Ford understood was to the victim. Thereafter, the victim showed up in his rented Mercury, and Ford and the defendant got into the car with him. Because Ford was familiar with Chattanooga, he drove. The victim was in the front passenger seat and the defendant was in the back seat. The three were cruising and headed in the direction of Hamilton Place Mall.

Cameron testified that the pretext which was used to get the victim to go on this car ride was that Ford, the defendant and another person were going to purchase some cocaine from the victim. In actuality, the defendant's plan was to rob the victim.

While Ford, the defendant and the victim were stopped at a traffic signal at the intersection of Lee Highway and Shallowford Road, a woman in a car behind the Mercury observed the driver (Ford) and the back-seat passenger (the defendant) jump on the person seated in the front passenger seat (the victim). At first, she thought they were horsing around, but then she saw that two or possibly all three of the men had drawn firearms. The eyewitness saw the man in the back seat "kind of angling the gun down over the fellow in the passenger seat." She saw the rear-seat passenger's hand jerk back, and she presumed the gun fired. Then, she saw a gun fly out the window. The back-seat passenger casually got out of the car, retrieved the gun, and returned to the car. The car quickly left the scene. The driver and the back-seat passenger pushed the front-seat passenger down onto the floorboard. The eyewitness testified that in her opinion, the back-seat passenger was not acting in self-defense when he shot the victim; rather, he and the driver were attacking the victim.

There was evidence that when the defendant first attempted to fire his weapon, it did not discharge, so he attempted to fire it a second time, which caused the victim's fatal injury. Ford, the driver of the car, testified that after the defendant shot the victim, the defendant asked the victim why he made him do that. The defendant also told the victim that he owed him money and should have honored the debt. The defendant and Ford returned to the Big Orange Car Wash, where they parted company.

Ford purchased marijuana and then went to his girlfriend's apartment in the Mansion Hills complex. Later that evening he met the defendant at Sammons'

apartment. The defendant was driving the victim's rental car. The victim's body was not in the vehicle. Ford saw a floor mat on the front passenger seat covering the victim's blood. Ford wiped his fingerprints from the car. The defendant wanted to go to the victim's motel room, so Ford, Cameron and the defendant left in Ford's car.

The defendant had a key which allowed the three access to the victim's motel room. Inside, they searched for money but were unable to locate any. They took two or three pieces of luggage from the room and returned to Mansion Hills. That evening, the defendant told Cameron in Ford's presence where he had disposed of the victim's body.

The next day, Marshall visited the defendant at Sammons' apartment. Marshall saw the victim's luggage in a bedroom.

Sometime in late April, the victim's rental car was discovered abandoned. A Chattanooga police officer had it towed to a private storage lot, where blood was discovered on the front passenger seat.

The defendant left Chattanooga and was for a time in Memphis. Eventually, he returned to California.

For months, investigation progressed, but the police department was unable to locate the victim's body. In January 1997, the police received information from Ford which led them to discover the victim's skeletonized remains in a wooded area. They also received information from Ford and the defendant's other associates which led to the charges against the defendant.

The defendant did not present evidence at trial; however, through cross-examination of witnesses he presented his theory that he shot the victim in self-defense because the victim pulled a gun on him while they were tussling. The jury rejected this theory and convicted the defendant of first degree murder and abuse of a corpse.

State v. Cormia, No. E1999-01504-CA-R2-CD, 2000 WL 343793, at **1-3 (Tenn. Crim. App., at Knoxville, April 4, 2000).

A Hamilton County jury convicted the Petitioner of first degree murder and abuse of a corpse on October 9, 1998, and the trial court imposed a sentence of life imprisonment with the possibility of parole plus a concurrent two year sentence. This Court affirmed the conviction on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. On October 9, 2001, the Petitioner filed a pro se post-conviction petition. On October 22, 2001, the post-conviction court appointed John McDougal to represent the Petitioner in this post-conviction matter. McDougal filed an amendment to Petitioner's original petition for post-conviction relief on

-4-

March 4, 2002. In his petition, the Petitioner asserted that he should be granted post-conviction relief based upon two theories: (1) ineffective assistance of counsel; and (2) prosecutorial misconduct in that the assistant district attorney general quoted from the Bible during his closing argument in violation of the First Amendment to the United States Constitution and to the prejudice of the Petitioner. The post-conviction court conducted a hearing on the amended petition on December 2, 2002. The trial court entered an order and memorandum opinion dismissing the Petitioner's post-conviction petition on February 18, 2003. The Petitioner filed a timely notice of appeal.

The following evidence was presented at the post-conviction hearing: The Petitioner testified that he was represented by Bill Dobson ("Counsel") during his first degree murder trial and that he was subsequently convicted of first degree murder. The Petitioner stated that he filed a petition for post-conviction relief because he felt that "the conviction was a little stiff." He testified that he had a problem with Counsel's representation because "there were a couple of witnesses that testified and they were actually contradicting themselves while they were on the witness stand." The Petitioner testified that a witness, Chris Cameron, "testified before when the jury was out that I wasn't a gang member, and [Counsel] asked him three different times and he told him no each time, but I am a gang member." The Petitioner explained that he informed Counsel of this contradictory testimony, but Counsel "[t]old me to hold on a second and kept kind of telling me to be quiet, and he never even raised the issue. . . . [Counsel] just let [the witness] keep testifying after he already lied under oath."

The Petitioner stated that he did not testify at his trial based upon Counsel's advice. The Petitioner explained, "I wanted to take the stand but [Counsel] strongly disagreed. . . ." He stated that "it was really my first kind of serious crime, and I didn't really know what to do, so I took his advice because I felt that he was more experienced in the situation." The Petitioner testified that Counsel met with him about eight times regarding his defense, "but it wasn't . . . enough to really go over the case and possibly come up with a strong defense." He stated that each session with Counsel lasted only thirty minutes, for a total of four hours of meetings with Counsel. The Petitioner explained that he attempted to write and call Counsel during this time of preparation, and "sometimes he would respond and other times he wouldn't."

The Petitioner testified that Counsel explained the charge of first degree murder to him and told the Petitioner that his defense would be self-defense. The Petitioner stated that Counsel did not want him to testify because his gang affiliations and criminal history would be damaging to his defense. The Petitioner explained that if he had testified, he would have "testified to the actual events that happened in the car on that day." He stated that he would have testified as follows:

> Well, I would have testified that myself, Mr. Green and Mr. Ford were in the car, that we were traveling to the, I believe it's called the Hamilton Place Mall, and on the way there, that me and Mr. Green got into a dispute about some money he owed, and he didn't like the way I was questioning him about it. He got upset, turned around in the seat and threw a couple of punches at me.

-5-

And I really didn't think he was serious until he actually hit me with one, and I responded back at him, I hit him actually harder than he hit me, and he turned around holding his face and said something to the fact of, "I'm not going out like that."

So when he jumped back, he jumped up again and turned around in the seat, and when he turned around, he was pulling his gun up, and Ford seen it and hit his hand and said, "He got a gun," because when he first did it and I seen it, I jumped and was going to reach for the door to get out the car.

And Ford knocked the gun out of his hand and he bent down to pick it back up and he was coming back up with it, and by this time I already pulled my gun out, and I kind of hesitated for a second because I didn't know what he really was going to do, but when he kept coming up with it, I just shot him.

The Petitioner testified that he did not believe that Counsel spoke to all the witnesses in his case. The Petitioner stated that he told Counsel about some witnesses who would help his defense, but stated, "I don't believe he called any witnesses. He just cross-examined everyone that the State put on." The Petitioner testified that Counsel did not explain to him why he did not call any witnesses. The Petitioner explained that he wanted to put on Jamie Sammons and the Petitioner's mother. He stated that at the time of trial, his mother was still in Los Angeles, but she could have flown to the trial in Tennessee. The Petitioner testified that Counsel never called his mother about the possibility of her testifying at the trial. He stated that his mother would have testified about the friendly relationship between the Petitioner and the victim.

The Petitioner testified that the killing was not premeditated or intentional because "[t]he gun . . . had one bullet and no clip. How could that be an intentional killing if, if you have one bullet and no clip?" He stated that he shot the victim because the victim was raising his gun and "I assumed he was going to shoot me." The Petitioner testified that Counsel "probably could have questioned the witnesses a little more. . . ." He stated that Counsel cross-examined witnesses using short and simple questions.

The Petitioner also testified that Counsel's physical handicap of blindness affected Counsel's ability to question witnesses and observe the jury. He stated that Counsel did not notice a juror who was sleeping during his trial because of Counsel's blindness. The Petitioner further testified that Counsel failed to investigate whether the Petitioner had any psychological problems or diminished mental capacity.

On cross-examination, the Petitioner admitted that had he testified, his criminal history and gang involvement would have come into evidence. He also stated that he would have testified about how he dumped the victim's body in the woods to conceal the crime. The Petitioner admitted that Cameron's testimony that the Petitioner was not in a gang actually helped the Petitioner at trial. He admitted that Counsel filed a motion in limine to exclude any reference to the Petitioner being a

member of a gang. The Petitioner admitted that he discussed all possible defenses with Counsel prior to trial, and they ultimately decided that self-defense was the best option. He also admitted that Counsel explained to him what witnesses the State was going to call and what facts the State was going to use. The Petitioner stated that Counsel thought self-defense was the best defense based upon the facts and evidence from the State and his discussions with the Petitioner. He admitted that Counsel presented the theory of self-defense "rather forcibly" to the jury. The Petitioner also admitted that Counsel questioned witnesses about the inconsistencies in their testimony and challenged the witnesses' credibility.

The Petitioner stated that Counsel explained the elements of the first degree murder charge to him prior to trial. The Petitioner further stated that he told the trial court that he chose not to testify at his trial because Counsel advised him not to take the stand. He admitted that Counsel had an investigator with the public defender's office working on the case. The Petitioner stated that Counsel would consult with the investigator and his assistant during the trial.

Karla G. Gothard, executive assistant district public defender, testified that she was the supervisor of the other assistant district public defenders in her office at the time of the Petitioner's trial. Gothard testified that Counsel was hired as a public defender in her office in 1989 and continued as a public defender until his death in May of 2002. She stated that prior to being hired as a public defender, Counsel had been in private practice as a criminal defense lawyer for nine or ten years. Gothard explained that Counsel was a trial lawyer in her office and worked in the juvenile court, general sessions court and criminal court. She stated that Counsel was blind, but that his handicap did not prevent him from being an effective criminal defense lawyer.

Gothard testified that her office maintains files on every case as part of the business records in her office. She explained:

> [A]fter the case . . . is closed, we maintain the file. We haven't destroyed any files. We move them off site to archives but we maintain them. Essentially at this point, we've maintained every one we've ever had. We maintain them for purposes of post-conviction petition, for appeals, for historical purposes. If we get another client, get the same client in the future, and also for those times when we have to respond to the Board of Professional Responsibility inquiries about a particular file. . . . We also maintain them and . . . we're very open with the files in sharing them. If there is a post-conviction petition that's filed, . . . we've never denied an attorney representing one of our former clients the right to see the file, and . . . many times I just give them the file and say, "Return it to me when you're done with it," rather than copying the whole thing.

Gothard testified that her office had the file that was generated as a result of Counsel's representation of the Petitioner, and that this file "was maintained as a necessary part of [her office's] business." Following this testimony, the State sought to introduce the Petitioner's file as an exhibit. The Petitioner's post-conviction counsel immediately objected to the introduction of this file. Gothard

testified about Counsel's file as follows:

> I can tell you that it is the file that is maintained in our office regarding [the Petitioner]. It's . . . a large, expandable brown envelope. There's what we call the blue file in here. It's the original file that's opened, and when the blue file–particularly if you're preparing something for trial, we usually take things out of the blue file, or if you receive documents that are too large to fit in the blue file, we will put that in expanding file folders with the file folder in it. I have reviewed, while I'm sitting here, what's in this file. . . . The file, the blue file is indicated as file number H-5111. . . . That's the file that, the number that's designated when it's first opened, and the same file number, H-5111, is shown on the, the expanding file.

Gothard then testified about the contents of the Petitioner's file in detail. She explained that she had not done any work the Petitioner's file. Gothard testified that she knew that the file was the Petitioner's because her office has a detailed filing system for clients. She explained:

> Each file has its own separate number as well as a blue file with the heading on it, and . . . the X on the side of the blue file here means that it is closed. It's placed away from active files to ensure, you know, its integrity, for one thing, and to ensure that, you know, . . . once they're closed, before they're closed, each attorney is supposed to go through and make sure that the documents that are in this file belong in this file.

Gothard further testified that she knew this was the Petitioner's file because several documents in the file had the Petitioner's name on them. The Petitioner's post-conviction counsel then objected to the relevance of the Petitioner's file being admitted into evidence. The trial court admitted the file into evidence as a business record but stated that Gothard would hold the exhibit until this Court requested the file.

Gothard testified that she did not work with Counsel on the Petitioner's case, but she had worked with Counsel on many other cases as both supervisor and co-counsel. She stated that "I appreciated having [Counsel] sit as second chair for me because of his insight and wisdom, and when [Counsel] had a trial, I would sit second chair for him and hopefully provide a little bit of insight and wisdom and acted as his eyes . . . in many cases." She explained that Counsel was a sighted attorney who lost his eyesight after many years of practicing law. Gothard testified that Counsel's disabilities did not hinder him from being an effective attorney. She explained:

> He had . . . other physical problems as well over the years. His blindness and the other physical problems were related to juvenile diabetes, and [Counsel] constantly amazed me in terms of how he functioned, that he functioned as well as he did. . . .
>
> I remember having a conversation with him and asked him how he did it,

"How do you come, stand up in front of a jury and do this?" I mean, I would be too afraid to do that, I think. . . . [Counsel] just always said that, "You know, Karla, what else can I do?" And he didn't say it in the sense of, you know, I can't do any other kind of business, but what else is there to do except go and do what you can do.

He had, I believe, three strokes during the time he was in our office and had to be out for periods of time. [Counsel] always came back before his doctors released him, quite frankly, I think on one occasion, and the other two times he came back before we expected him to come back, always anxious to, to be a lawyer, to be a trial lawyer.

[Counsel] was a joy to supervise, because if you had something, as a supervisor, if I had an assignment or a particular case that I'd need to talk to the staff about, . . . [Counsel] would always volunteer for things. He never shirked his responsibility in any way. He's quite admirable, I think. . . .

[Counsel] tried, I think, more cases than any other assistant [public defender] in our office ever tried, including me. He tried many more than I did.

And as I said, a lot of times he would volunteer to assist people in trials or . . . he sometimes assisted by trying cases where a conflict, a personality conflict arose between an attorney and their client, and many times [Counsel] would be the one to take over that case, volunteer to do it and try the case.

Gothard testified that Counsel did not have the mobility skills nor the Braille skills of people who lose their eyesight at an early age, but her office acquired funding to provide Counsel with a reader who would assist him. She testified, "I admired [Counsel] so much that I can only offer praise for him as a person and as a lawyer." She stated that Counsel's greatest ability was in talking to a jury and getting the jury to like him. Gothard explained, "I think that overall, through the years that I tried cases with him, I think he was very good at building a relationship with a jury. . . . I think they felt admiration for him as well, but he was . . . very good, personable with the jurors." She stated that Counsel also did an excellent job at focusing on the real issues of a case and trying "a clean case" by not getting bogged down in side issues. Gothard testified that Counsel's sense of hearing was so great that he could tell when the jurors were stirring around and getting fidgety. Also, she explained that "[h]e could hear people snore if they went to sleep, and he would, you know, raise his voice or ask for a . . . recess or something of that sort."

Gothard testified that she did not have any knowledge about what happened at the Petitioner's trial, but the Petitioner's file contained notes regarding the trial and the dates that Counsel visited with the Petitioner. She stated that according to the file, Counsel visited with the Petitioner at least eight times at the jail to prepare for trial.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203 (1997). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

On appeal, the Petitioner argues the following four issues: (1) that the post-conviction court

erred by finding that the Petitioner was not denied effective assistance of counsel; (2) that the post-conviction court erred by admitting Counsel's file of the Petitioner into evidence as a business record; (3) that the post-conviction court erred by admitting hearsay testimony of Counsel into evidence; and (4) that the post-conviction court erred by not granting post-conviction relief based upon the fact that the assistant district attorney general quoted from the bible in his closing argument at the Petitioner's trial.

First, the Petitioner argues that the post-conviction court erred by finding that the Petitioner was not denied effective assistance of counsel. In the post-conviction hearing, the Petitioner raised several grounds regarding whether Counsel provided the Petitioner with effective assistance during his trial.[1] However, in his appellate brief, the Petitioner bases his argument that he was denied effective assistance of counsel upon only one ground: "that counsel failed to adequately meet with [the Petitioner] to adequately prepare him for trial and to discuss procedures and trial strategies with him." Because the Petitioner failed to raise the other issues relating to his ineffective assistance of counsel claim in his appellate brief, the Petitioner has waived those issues. Tenn. R. App. P. 13(b); Nichols v. State, 90 S.W.3d 576, 607 (Tenn. 2002).

During the post-conviction hearing, the Petitioner testified that Counsel met with him about eight times regarding his defense, "but it wasn't . . . enough to really go over the case and possibly come up with a strong defense." He stated that each session with Counsel lasted only thirty minutes, for a total of four hours of meetings with Counsel. The State presented proof, through the testimony of Gothard, which corroborated the Petitioner's assertion that Counsel met with the Petitioner at least eight times. The State also presented proof that Counsel's assistant and investigator visited with the Petitioner on various occasions prior to the trial. The Petitioner failed to present any proof that this amount of conference time was insufficient for Counsel to prepare the Petitioner's defense. Furthermore, the Petitioner failed to present any proof that the lack of visits with Counsel somehow prejudiced him at trial. To the contrary, the Petitioner testified that Counsel explained the charges against him, which defenses would be best at trial, and who would testify against him at trial. The Petitioner also testified that Counsel discussed the possibility of the Petitioner testifying at trial and advised the Petitioner not to take the stand. Accordingly, we conclude that Counsel's performance in defending the Petitioner "falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Furthermore, the Petitioner has failed to prove that Counsel's performance prejudiced his defense, resulting in a failure to produce a reliable result. Strickland, 466 U.S. at 687; Cooper, 849 S.W.2d at 747. Therefore, we conclude that the Petitioner has failed to prove ineffective assistance of counsel by clear and convincing evidence, and the post-conviction court did not err by finding that the Petitioner received effective assistance of counsel.

Next, the Petitioner argues that the post-conviction court erred by admitting Counsel's file

---

[1]In addition to testifying that Counsel did not adequately meet with him prior to trial, the Petitioner testified at the post-conviction hearing that Counsel failed to investigate the Petitioner's competence to stand trial, that Counsel erroneously advised him not to testify at trial, that Counsel did not object to the testimony of a witness who lied on the stand, and that Counsel's blindness harmed the Petitioner's case at trial.

on the Petitioner into evidence and allowing Gothard to testify about its contents. The post-conviction court admitted the file into evidence based upon the business records hearsay exception. The admissibility of evidence is a matter within the discretion of the trial court and will be overturned only when there is an abuse of that discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1993). Tennessee Rule of Evidence 803(6) provides that the following are not excluded by the hearsay rule:

> Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

In order for the records to have sufficient indicia of trustworthiness to qualify as a business record, "the record must have been made in the 'regular practice of that business activity,' and it must have been 'kept in the course of a regularly conducted business activity.'" Neil P. Cohen et al., *Tennessee Law of Evidence,* § 8.11 [6] (4th ed. 2000); see also State v. Dean, 76 S.W.3d 352, 365 (Tenn. Crim. App. 2001). While records prepared for an irregular purpose with litigation in mind "may not be made in the regular course of business and may be inadmissible as a business record under Rule 803(6)," investigative accident reports compiled as a routine matter by a business "should not be excluded solely because litigation sometimes ensues following an accident." Cohen, supra, at § 8.11 [6].

We conclude that the post-conviction court did not abuse its discretion by admitting Counsel's file of the Petitioner into evidence as a business record. Karla Gothard, executive assistant district public defender, testified about her office's policies and procedures concerning the maintenance of the clients' files. Gothard demonstrated extensive knowledge about the filing system and testified that the files were created in the ordinary course of business at her office. Accordingly, Gothard sufficiently authenticated Counsel's file as a business record. Furthermore, the post-conviction court did not err by allowing Gothard to testify about the contents of Counsel's file because the file was properly admitted into evidence as a business record.[2]

---

[2]We note that the Petitioner also argues in his appellate brief that "any statements by [Counsel] are prohibited by the Dead Man's Act . . . which renders certain testimony by . . . persons now deceased inadmissible." Tennessee Code Annotated section 24-1-203 (2000) states as follows:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments

The Petitioner's next issue on appeal is whether the post-conviction court erred in allowing the hearsay testimony of Counsel into evidence. However, the Petitioner does not cite to the record to indicate what "hearsay testimony" he objects to on appeal. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See also Tenn. R. App. P. 27(a)(7); State v. Rhoden, 739 S.W.2d 6, 14 (Tenn. Crim. App. 1987). Therefore, we conclude that the Petitioner has waived this issue.

Finally, the Petitioner argues that the post-conviction court erred by not granting relief based upon the Petitioner's assertion that "the Defense Counsel in the original appeal never brought up the error that the state used [B]iblical quotations in his closing argument." The post-conviction court found that the Petitioner's prosecutorial misconduct claim had been waived because the Petitioner failed to raise the claim on direct appeal. Tennessee Code Annotated section 40-30-206(g) (1997) provides that:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

The Petitioner's ground for relief that the assistant district attorney general improperly quoted from scripture in his closing argument should have been brought on direct appeal, and this claim for relief is not "based upon a constitutional right not recognized as existing at the time of trial." Also, the Petitioner's failure to present this claim on direct appeal was not "the result of state action in violation of the federal or state constitution." Accordingly, we conclude that the post-conviction court did not err in finding that the Petitioner waived this issue. Furthermore, we conclude that the Petitioner has waived this issue because he failed to cite to any authorities in support of his argument in his appellate brief. Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).

---

may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party.

By its express terms, the "Dead Man's Statute" only applies "[i]n actions or proceedings by or against executors, administrators, or guardians." In this case, the Petitioner did not file an action against an estate, rather he filed a petition for post-conviction relief. Therefore, the "Dead Man's Statute" is inapplicable to this case.

### III.  Conclusion

In accordance with the forgoing authorities and reasoning, we AFFIRM the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE